IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAMELA PENDLETON, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-6619 |
| | : | |
| JEVS HUMAN SERVICES, INC., et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                             **May 29, 2020**

Plaintiffs Pamela Pendleton and Vernon Costin bring this putative class and collective action lawsuit against Defendants JEVS Human Services, Inc. and Jewish Employment & Vocational Service, Inc. d/b/a JEVS Human Services (collectively, JEVS). Plaintiffs assert JEVS failed to pay them, and the other members of the proposed class, minimum wage and overtime wages and failed to provide them with employee benefits for their "Lifesharing" services. JEVS moves for summary judgement pursuant to Federal Rule of Civil Procedure 56(a), asserting Plaintiffs have failed to prove they are employees within the meaning of the Fair Labor Standards Act and Pennsylvania Minimum Wage Act. Because there are no genuine disputes of material fact that Lifesharing Providers are independent contractors and JEVS is therefore entitled to judgment as a matter of law, the Court will grant JEVS's motion for summary judgment.

**BACKGROUND**[1]

JEVS is a Pennsylvania non-profit corporation that provides "Adult Residential & Day Services" to adults with developmental and intellectual disabilities and mental illness. JEVS provides "help at home, on the job, and in the community" for these individuals. Among other

---

[1] In evaluating a motion for summary judgment, a court must "view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Except where noted, the facts presented herein are undisputed.

programs offered as part of its Adult Residential & Day Services, JEVS provides "Lifesharing" services. Lifesharing provides adults with intellectual disabilities the opportunity to live with a family or individual and share life experiences. Lifesharing is when "somebody takes an individual with an intellectual disability into their home to live with them and to provide support similar to the foster care model." Thompson Dep. 20-21.

## A. The Lifesharing Regulations and the People Involved in the Lifesharing Arrangement

The Pennsylvania Department of Human Services has promulgated a series of regulations governing Lifesharing programs, 55 Pa. Code § 6500 et seq. (the Lifesharing Regulations).[2] The Lifesharing Regulations define the roles of the persons involved in the Lifesharing arrangement and provide guidance on how Lifesharing services should be provided. Under these regulations, an "Individual" is "a person with an intellectual disability who resides, or receives residential respite care, in a family living home and who is not a relative of the owner of the family members." 55 Pa. Code § 6500.4. An "Agency" is a "legally constituted organization administering one or more family living homes." *Id.* JEVS is an Agency under the Lifesharing Regulations.

The Lifesharing Regulations do not explicitly define the role of caregivers who provide Lifesharing services.[3] JEVS refers to persons who render Lifesharing services through its program as "Lifesharing Providers."[4] Thompson Dep. 21. Both Pendleton and Costin were Lifesharing

---

[2] Since JEVS filed its motion, 55 Pa. Code § 6500 has been amended and is no longer consistent with the version the parties relied on in their briefing. The citations to § 6500 in this Memorandum are to the 2016 version of § 6500. *See* Mot. for Summ. J. Ex. 3.

[3] Section 6500.4, however, provides a definition of a "family living home or home," which is "[t]he private home of an individual or a family in which residential care is provided to one or two individuals with an intellectual disability . . . ."

[4] Plaintiffs refer to these individuals as "primary life-sharing caregivers," noting that the Lifesharing Regulations provide a different definition for "provider." *See* 55 Pa. Code § 6500.4

Providers for JEVS. Pendleton became a Lifesharing Provider in November 2013, while Costin became a Lifesharing Provider in 2011. Pendleton served as a Lifesharing Provider to one Individual for JEVS—M.S. Costin served as a Lifesharing Provider to four Individuals for JEVS— J.M., T.A., J.W., and T.P.

In addition to the Agency and Lifesharing Provider, Individuals may receive support from other persons and organizations. For example, an Individual is typically supported by a Family Living Specialist, who is an individual employed by the Agency whose duty, among others, is to "[s]upervis[e], monitor[] and evaluat[e] services provided to the individual." *See* 55 Pa. Code § 6500.43. Individuals may also receive Lifesharing services from a Respite Provider, who provides "temporary family living care" when the primary Lifesharing Provider is unavailable.[5] *See id.* § 6500.4. The Individual may also be supported by a Supports Coordinator Organization (SCO), which is an entity separate from the Agency that locates, coordinates, and monitors services provided to an Individual in Lifesharing through a Supports Coordinator. *See id.*

Pursuant to the Lifesharing Regulations, each Individual receiving Lifesharing services is required to have an Individual Support Plan (ISP). The ISP is a "comprehensive document that identifies services and expected outcomes for an individual." *See id.* The ISP is developed by the Family Living Specialist, when an Individual is not receiving care from an SCO. It identifies the

---

("Provider—An entity or person that enters into an agreement with the Department [of Human Services] to deliver a service to an individual."). For brevity, and because Plaintiffs also use the term "Lifesharing Providers" in response to JEVS's motion, the Court refers to individuals who provide Lifesharing services as "Lifesharing Providers."

[5] As discussed below, Respite Providers are typically subject to the same requirements as the primary Lifesharing Providers under the Lifesharing Regulations. Respite Providers are exempt from certain requirements, however, such as receiving annual training. *See* Pa. Code § 6500.201 (providing the sections of the Lifesharing Regulations that do not apply for "individuals receiving respite care").

"[s]ervices provided to the individual and expected outcomes chosen by the individual and individual's plan team" and "[s]ervices provided to the individual to increase community involvement, including volunteer or civic-minded opportunities and membership in National or local organizations . . . ." *See id.* § 6500.153(1)-(2). Depending on the needs of the Individual, the ISP may also include "a protocol and schedule for outlining specified periods of time for the individual to be without direct supervision"; "a protocol to address the social, emotional and environmental needs of the individual"; and "a protocol to eliminate the use of restrictive procedures . . . and to address the underlying cause of the behavior which led to the restrictive procedures . . . ." *See id.* § 6500.153(4)-(6). The ISP is implemented by the ISP Team, which includes the Individual, a Family Living Specialist, a service worker from the Agency, and anyone the Individual chooses to invite. The ISP team holds meetings to evaluate the Individual's progress.[6]

### B.  JEVS's Matching of Individuals and Lifesharing Providers

As an Agency, JEVS finds its Lifesharing Providers through a variety of ways, including open houses. The most common way for Individuals to enter JEVS's Lifesharing program is through referrals either from the Intellectual Disability Services Division of Pennsylvania's Office of Developmental Program or Support Coordinators. JEVS then facilitates the placement of Individuals with Lifesharing Providers. JEVS does not unilaterally place Individuals with potential Lifesharing Providers.[7] To do so, JEVS: (a) sets up interviews where Individuals meet potential

---

[6] Plaintiffs contend JEVS required Lifesharing Providers to attend these meetings.

[7] Plaintiffs dispute this fact. However, Plaintiffs do not dispute that *both* the Individual and Lifesharing Provider must consent to a Lifesharing arrangement. In other words, it is undisputed that JEVS *cannot* unilaterally place an Individual in a Lifesharing Provider's home. Thus, Plaintiffs do not genuinely dispute this fact.

Lifesharing Providers who may meet the Individual's preferences; (b) if an Individual likes a potential Lifesharing Provider, JEVS schedules the Individual for day and overnight visits with the potential Lifesharing Provider; (c) if all parties report that the visits went well, JEVS asks the Individual and the potential Lifesharing Provider if they want to enter into a Lifesharing arrangement; and (d) if the Individual and the potential Lifesharing Provider both agree, JEVS holds a transition meeting and the Individual will move into the Lifesharing Provider's home after the end of a notice period. Prior to an Individual entering a potential Lifesharing Provider's home, the potential Lifesharing Provider also undergoes a background check pursuant to the Lifesharing Regulations. *See* 55 Pa. Code § 6500.23.

During the Lifesharing arrangement, Lifesharing Providers host Individuals in homes the Providers personally rent or own. Before an Individual moves into a potential Lifesharing Provider's home, JEVS inspects the home as required by the Lifesharing Regulations. *See id.* § 6500.17 ("If an agency is the legal entity for the family living home, the agency shall complete a self-assessment of each home the agency is licensed to operate . . . to measure compliance with this chapter."). JEVS's Family Living Specialists inspect each home using a checklist that tracks the requirements of the Lifesharing Regulations. *See id.* ("The agency shall use the Department's licensing inspection instrument for this chapter to measure and record compliance."). Generally, JEVS's Family Living Specialists check to see if there are smoke detectors on every level, the floors have skids on the steps, the water temperature does not exceed 120 degrees, the locks on the door are compliant, and there is a landline telephone in the home. *See* Mot. for Summ. J. Ex. 50.

If a potential Lifesharing Provider's home does not pass inspection, he or she is given 30 days to address the issues identified.[8]

### C. The Lifesharing Contracts and Lifesharing Provider Obligations

In addition to ensuring the safety and compliance of a Lifesharing Provider's home, JEVS is responsible for monitoring the Lifesharing services Individuals receive from Lifesharing Providers. To do so, JEVS enters into Lifesharing contracts with the Lifesharing Providers. A new Lifesharing contract is entered into every time an Individual moves into a new home. Certain contracts refer to the Lifesharing Provider as an independent contractor while others do not. The Lifesharing contracts provide for a one-year term, but automatically renew each year if the Lifesharing arrangement continues. *See id.* Ex. 14, at ¶ 2; *id.* Ex. 15, at ¶ 2.  A Lifesharing Provider is nevertheless free to end the Lifesharing arrangement and contract at any time by giving JEVS 30-days written notice.[9]

These contracts, although varying from year-to-year, impose certain requirements on Lifesharing Providers. Generally, Lifesharing Providers agree to provide "room, board, care, instruction, support, supervision, transportation and other services" consistent with the Lifesharing Regulations. *See id.* Ex. 14, at 1; *id.* Ex. 15, at 1. Lifesharing Providers are also contractually required to undergo 24 hours of training mandated by the Lifesharing Regulations. *See id.* Ex. 14,

---

[8] These home inspections continue throughout the time that an Individual resides in a Lifesharing Provider's home. Although the parties agree that JEVS conducts these checks, they nevertheless dispute the reason and purpose for them. JEVS contends it conducts monthly monitoring visits "to check and document that the home is compliant with the Lifesharing Regulations, see if the Provider needs any support, and check on the well-being of the Individual." Statement of Material Facts ¶ 288. Plaintiffs characterize these checks are more than "compliance" visits wherein JEVS visits homes and provides specific instructions to Lifesharing Providers on how to provide their services. *See* Resp. to Statement of Material Facts ¶ 288.

[9] In other instances, such as an Individual's behavior becoming unmanageable, a Lifesharing Provider may end the Lifesharing arrangement without 30-days written notice.

at ¶ 6; *id.* Ex. 15, at ¶ 6. JEVS provides this training to Lifesharing Providers at its quarterly meetings. If a Lifesharing Provider is unavailable to attend a quarterly meeting, JEVS schedules a makeup session for the Lifesharing Provider. Lifesharing Providers are not required to bring anything to these meetings nor are they given any work to do outside of the meetings. JEVS also provides training to Lifesharing Providers by supplying documentation to them. *See* Resp. in Opp'n Ex. 3, at 94 (providing a 25-slide PowerPoint on how to complete progress notes was provided to Lifesharing Providers as part of their annual "documentation training").

Lifesharing Providers are further contractually required to submit weekly progress notes for their Individuals. Progress notes recap the Individual's progress toward his or her personal goals on a weekly basis. Under the Lifesharing Regulations, JEVS's Family Living Specialist is required to compile a monthly progress report for each Individual for the Department of Human Services. *See* 55 Pa. Code § 6500.43(d)(10) (providing the family living specialist is responsible for "reviewing, signing and dating the monthly documentation of an individual's participation and progress toward outcomes"). To complete these monthly reports, JEVS requires Lifesharing Providers to provide weekly progress notes. *See* Resp. in Opp'n Ex. 5, at 40 ("Q. Does JEVS still require its life sharing providers to provide progress notes weekly? A. Yes . . . it gives the specialist an idea of what is going on in the home . . . [and] also allows the specialist to do their monthly visit, their monthly summary and their quarterly summary off of the information they get from the progress notes."). JEVS provides guidance to Lifesharing Providers on how to write progress notes at its quarterly meetings and through documentation. *See* Mot. for Summ. J. Ex. 20.[10]

---

[10] The parties dispute the extent of the guidance JEVS provides Lifesharing Providers. JEVS contends it provides minimal guidance on how to complete progress notes and progress notes mainly track the goals in the Individual's ISP. Plaintiffs assert JEVS is significantly involved in directing how progress notes are to be completed, including providing step-by-step instructions on how to complete them and specifying how the Individual's goals are to be defined.

Lifesharing Providers are further required to sign and submit an attendance calendar on a bi-weekly basis. The attendance calendar is used by JEVS to pay Lifesharing Providers a daily "stipend." Lifesharing Providers receive $68 for each day they host an Individual.[11] *See* Mot. for Summ. J. Ex. 8, at ¶ 14. If an Individual is hosted by a Respite Provider, the Respite Provider receives payment for each day he or she hosted the Individual. Stipends are paid on a bi-weekly basis and non-taxable. To receive their stipend, Lifesharing Providers are required to attend their quarterly meetings—where they receive their statutorily mandated training—and submit their progress notes. If a Lifesharing Provider fails to do so, their stipend payment is delayed until the outstanding obligations are fulfilled.

Although Lifesharing Providers contract to provide Lifesharing services to Individuals, Lifesharing Providers retain the ability to maintain outside employment. For example, while Pendleton was a Lifesharing Provider with JEVS, she also worked full-time at JEVS community living homes/group homes, worked on-call at a homeless shelter, and owned and operated two businesses. Pendleton earned a salary from her work at JEVS of approximately $40,000 per year plus benefits. As an employee for JEVS and a Lifesharing Provider, Pendleton was known as a "dual role" provider. Similarly, while providing Lifesharing Services, Costin maintained full-time employment as a SEPTA bus operator, earning a salary of approximately $70,000 plus benefits.[12]

**D.  JEVS's Room and Board Contracts with Individuals**

In addition to entering into contracts with Lifesharing Providers, JEVS also enters into a "Room and Board Contract" with each Individual. *See* Resp. in Opp'n Ex. 15, at 2. In these Room

---

[11] The stipend has increased from $60 in 2016.

[12] At the time Costin applied to be a Lifesharing Provider, he was employed with JEVS to provide services to disabled individuals living in group homes on a per diem basis.

and Board Contracts, Individuals agree to pay JEVS monthly "room and board."[13] *Id.* The monthly room and board payment is calculated as "72 percent of the [Individual's social security income] maximum rate plus Pennsylvania State Supplementary Payment."[14] *Id.* This payment is made directly to JEVS, not the Lifesharing Provider. JEVS uses the room and board payments to pay for its expenses in running the Lifesharing program and Lifesharing Providers' stipends. *See* Mot. for Summ. J. Ex. 8, at ¶ 11 & 13.

The Room and Board Contracts generally follow the requirements set forth in 55 Pa. Code § 51. *Compare* Resp. in Opp'n Ex. 15 (providing a JEVS-issued Room and Board Contract), *with* Reply in Supp. of Mot. for Summ. J. Ex. B (providing a sample Room and Board Contract from the Pennsylvania Department of Public Welfare). The Room and Board Contracts, however, also contain an addendum. The addendum provides JEVS the right to evict an Individual from a Lifesharing Provider's home if any of the following occur: "a) the end of the term of the Contract; b) the breach of any terms in the Contract; or c) the failure of the [Individual] to pay when due the amount of room and board . . . or any other amounts due . . . ." *See* Resp. in Opp'n Ex. 15. The eviction provisions set forth in the addendum are not required or provided for under 55 Pa. Code § 51. *See* Reply in Supp. of Mot. for Summ. J. Ex. A.

---

[13] Plaintiffs characterize the room and board payment as "rent," asserting JEVS interjects itself as a landlord into the Lifesharing arrangement. JEVS disputes this characterization and contends Plaintiffs' use of the term "rent" to refer to room and board is a misnomer because 55 Pa. Code § 51 sets the formula by which each Individual's room and board amount is calculated based on the Individual's social security income, benefits, income, and other income.

[14] If an Individual has no viable income, JEVS does not charge room and board until the Individual is able to obtain a source of income. *See* Mot. for Summ. J. Ex 8, at ¶ 10.

### E.  The Day-to-Day Lifesharing Arrangement[15]

Once the Individual moves into the Lifesharing Provider's home, Lifesharing Providers and their Individuals engage in daily life activities together, typically without the involvement JEVS. For example, Lifesharing Providers (1) decide where to take Individuals shopping; (2) decide when and where to take Individuals out to eat; (3) decide their own entertainment and activities; (4) do not need permission from JEVS to introduce Individuals to family and friends; and (5) do not need permission from JEVS to take Individuals on vacations.[16]

Lifesharing Providers also assist their Individuals in maintaining employment and independent activities. The Individual who paired with Pendleton, M.S., worked for ShopRite for eight hours each week and attended "Applied Packaging Services" (APS)—a state-funded shelter workshop—three to four days a week. Pendleton helped M.S. learn how to use public transportation to get to and from ShopRite and APS.

Despite engaging in life activities together without the involvement of JEVS, Lifesharing Providers are required by their Lifesharing contracts to perform certain daily activities and services for the Individual. For example, in Costin's 2012 contract with JEVS for providing Lifesharing services to T.A., Costin was required to: (a) encourage appropriate and continued communication with T.A.'s natural family and other pre-existing relationships; (b) pursue and maintain T.A.'s involvement and participation in activities he desired; (c) arrange for T.A.'s transportation to day

---

[15] The parties have provided numerous facts regarding the day-to-day arrangement for Lifesharing Providers and Individuals. For purposes of this Memorandum, the Court has only recounted a select portion.

[16] Pursuant to the Lifesharing contracts, Lifesharing Providers must nevertheless inform JEVS before taking Individuals out of the Commonwealth. *See* Mot. for Summ. J. Ex. 15, at 2.

programs, activities, and employment; and (d) schedule and accompany T.A. to medical appointments.[17]

Costin and Pendleton further state JEVS provided step-by-step instructions on how to provide Lifesharing services to the Individuals. *See* Resp. in Opp'n Ex. 7, at ¶ 22; Ex. 8, at ¶ 14; Ex. 9, at ¶ 5; Ex. 10, at ¶ 11. For example, for M.S., Plaintiffs contend JEVS instructed Pendleton to: take M.S. to community outings—including attending church, going shopping, and attending JEVS community events; conduct regular fire drills in her home; supervise when and how M.S. dressed for the day; monitor M.S.'s use of medication; purchase specific foods and prepare meals for M.S.; enforce a nightly curfew set by JEVS; and ensure M.S. got to his job at ShopRite. JEVS also required Pendleton to maintain and have M.S.'s pay stubs, copies of daily attendance sheets, and doctors' appointments ready for JEVS's inspection. Similarly, for the Individuals paired with Costin, T.A. and T.P., Plaintiffs contend JEVS required Costin to: attend community outings with T.A.; take T.A. to Alcoholics Anonymous and get him "hooked up with a sponsor"; assist T.P. with cleaning his room; enforce and report violations of JEVS's curfew for T.P; and wash T.P.'s laundry.[18]

### F.  Termination of "Dual Role" Lifesharing Arrangements with JEVS

On April 18, 2016, JEVS sent an email to Pendleton regarding her Lifesharing arrangement with M.S. The email states that as of May 31, 2016, JEVS "will be giving [a] thirty day (30) termination notification to all contracted Lifesharing Providers who are also employees at JEVS

---

[17] Pendleton's 2014 contract with JEVS for providing Lifesharing services to M.S. contained the same requirements. *See* Mot. for Summ. J. Ex. 14

[18] In some instances, Individuals became self-sufficient in certain tasks, such as M.S. becoming "travel trained" for travel to and from work and T.P. being able to wash his own laundry. However, Plaintiffs contend that, even where the Individuals became largely self-sufficient, they required oversight from Lifesharing Providers.

Human Services." Resp. in Opp'n Ex. 13. JEVS further stated it would "no longer allow JEVS employees to serve as independent contractors with the Lifesharing program."[19] *See id.* On June 30, 2016, JEVS ended its practice of allowing JEVS employees to also serve as Lifesharing Providers and Pendleton's Lifesharing arrangement with M.S. and JEVS ended. Pendleton nevertheless continued to provide Lifesharing services to M.S. through Kencrest, another Agency located in Philadelphia.[20]

### G.  The Instant Action

On December 23, 2016, Pendleton and Costin filed the instant putative class and collective action alleging JEVS failed to pay them and the other members of the proposed class minimum wage and overtime wages under the Fair Labor Standards Act (FLSA) and the Pennsylvania Minimum Wage Act (PMWA).[21] JEVS moves for summary judgment on the threshold issue of whether Plaintiffs have met their burden to establish that they were employees of JEVS under the FLSA and PMWA. Plaintiffs oppose JEVS's motion and argue the undisputed facts show that Lifesharing Providers are employees under the FLSA and PMWA.

---

[19] The parties dispute the reason for JEVS ending its "dual role" program. JEVS contends it ended this program because it was concerned that it may pose a conflict of interest between a Lifesharing Provider's responsibilities in Lifesharing and his or her employment position with JEVS. Plaintiffs contend the reason for the end of this program was because of recent guidance from the United States Department of Labor's promulgation of the "Home Care Rule," which Plaintiffs argue would require dual role providers to be considered employees. Regardless, the reason for JEVS ending its dual role program is not relevant for purposes of JEVS's motion.

[20] Based on Costin's deposition, it appears he still provides Lifesharing services to T.P., but it does not state whether he continues to provide them through JEVS or another Agency. *See* Costin Dep. 8 ("Q. Now, who do you live with? A. The client, [T.P.].").

[21] Plaintiffs also brought claims violation of the Pennsylvania Wage Payment and Collection Law; breach of contract, unjust enrichment; conversion; discrimination in violation of 42 U.S.C. § 1981; and accounting pursuant to the Employee Retirement Income Security Act of 1974. The Court dismissed these claims with prejudice on August 25, 2017. *See* Order, Aug. 25, 2017, ECF No. 33.

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The issue before the Court is narrow—whether Lifesharing Providers are employees or independent contractors under the FLSA and PMWA.[22] To succeed on their claims, Plaintiffs must prove they are "employees." *See* 29 U.S.C. §§ 203, 206-07. Under the FLSA, an "employer" is

---

[22] Pennsylvania courts "have looked to federal law regarding the FLSA for guidance in applying the PMWA." *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142 (3d Cir. 2020) (citing *Dep't of Labor & Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (2004)). Therefore, the Court will analyze both claims under the FLSA standard.

"any person acting directly or indirectly in the interest of an employer in relation to an employee," and an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(d)(1), (e)(1). To determine employee status under the FLSA, the Third Circuit applies the six-factor test, known as the "economic reality" test, articulated in *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376 (3d Cir. 1985). The factors considered include:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered required a special skill; 5) the degree of permanence of the working relationship; [and] 6) whether the service rendered is an integral part of the alleged employer's business.

*Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142 (3d Cir. 2020) (citing *DialAmerica*, 757 F.2d at 1382). In analyzing the *DialAmerica* factors, the Court recognizes that, "when Congress promulgated the FLSA, it intended it to have the broadest definition of employee." *Id.* (internal quotation marks omitted)

No single factor in the *DialAmerica* analysis is dispositive. *See id.* at 143. Rather, "courts should examine the circumstances of the whole activity, determining whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service." *Id.* (internal quotations and citation omitted). The plaintiff bears the burden of demonstrating that he or she is an employee under the FLSA. *See id.* (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)). Applying the economic reality test to the instant case, the Court finds there are no genuine disputes of material fact that Lifesharing Providers are independent contractors. The Court will therefore grant JEVS's motion for summary judgment.

14

### A. Consideration of Fact Sheet 79G

In its motion, JEVS urges the Court to focus on the Department of Labor (DOL) guidance provided in Fact Sheet 79G. In Fact Sheet 79G, the DOL provides guidance on "how the FLSA's requirements may apply to home care work that occurs in shared living arrangements," such as Lifesharing arrangements. Mot. for Summ. J. Ex. A, at 1. In Section 1(a) of Fact Sheet 79G, the DOL states that in arrangements "in which the third party's [i.e., an Agency's] role is limited, as is generally true, the provider will also not be an employee of a third party." *Id.* at 2. The DOL further notes that the two most important economic reality test factors are "the degree of control the potential employer exercises over the worker and the extent of the relative investments of the worker and potential employer." *Id.* In applying the economic reality test, Fact Sheet 79G provides an employment relationship likely does not exist where an Agency's role is "to recruit providers into the program, facilitate matching of consumers and providers, oversee quality management and monitoring compliance with licensing and other program requirements once the arrangement is established, and set the amount the adult foster care provider will be paid . . . ." *Id.*

In contrast, in Section 1(b), the DOL states an employment relationship will likely exist in a Lifesharing arrangement "in which a third party (perhaps through a case manager) is so involved in the provider's relationship with the consumer that the third party's role becomes one of direction and management of the workplace." *Id.* at 3. As an example, Fact Sheet 79G states a provider will likely be an employee of "a[n] [Agency] that finds and rents a residence in which the arrangement can occur, or whose case manager makes frequent visits or phone calls to the home specifically to instruct the provider about particular tasks to perform or ways to fulfill or not fulfill duties." *Id.* at 4.

Because Fact Sheet 79G provides guidance on how to analyze and weigh the factors of the economic reality test, the Court will consider Fact Sheet 79G in its application and balancing of the economic reality test factors. The Court thus turns to the analysis of the economic reality test factors in this case.

### B.  Analysis of the Economic Reality Test Factors

Here, the control, permeance, and integral factors weigh in favor of finding that Lifesharing Providers are independent contractors. In contrast, the profit and loss, investment, and special skill factors weigh in favor of finding that Lifesharing Providers are employees. In balancing the factors, the undisputed facts show the economic reality is that Lifesharing Providers are not dependent on JEVS. The Court thus finds Lifesharing Providers are independent contractors and will grant JEVS's motion for summary judgment.

#### 1.  Right to Control

The first factor—the extent JEVS had the right to control the work of Lifesharing Providers—weighs in favor of finding that Lifesharing Providers are independent contractors because JEVS only maintained a limited right to control Lifesharing Providers. In evaluating the control factor, courts look to "the degree of supervision over the worker, control over the worker's schedule, and instruction as to how the worker is to perform his or her duties." *Bamgbose v. Delta–T Grp., Inc.*, 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010). The inquiry focuses on whether the alleged employer had a right to control—not whether the alleged employer actually exercised control. *See Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 321 (3d Cir. 2016) ("It is the existence of the right to control that is significant, irrespective of whether the control is actually exercised.").

In evaluating this factor, the Court will also consider the DOL's guidance in Fact Sheet 79G, given that Fact Sheet 79G's guidance focuses on an Agency's degree of control and role in

the Lifesharing arrangement. Thus, applying Fact Sheet 79G, the control factor weighs in favor of independent contractor status where the Agency has a limited role in the Lifesharing arrangement, i.e., recruiting Lifesharing Providers, monitoring compliance with the Lifesharing Regulations, and setting the Lifesharing Providers' reimbursement rate. *See* Mot. for Summ. J. Ex A, at 1. However, the control factor weighs in favor of employee status where the Agency's role becomes one of direction and management of the workplace, i.e., JEVS finds and rents the home in which the arrangement can occur, or JEVS's Family Living Specialist makes frequent visits or phone calls to the home to instruct the provider about particular tasks to perform or ways to fulfill or not fulfill duties. *See id.* at 2.

Consistent with guidance from Fact Sheet 79G, the undisputed facts show that JEVS had a limited right to control Lifesharing Providers and its purpose was limited to recruiting Lifesharing Providers, facilitating the matching of Individuals and Lifesharing Providers, overseeing compliance with the Lifesharing Regulations, and setting the Lifesharing Providers' stipend rate. At the outset, the Court notes that the parties do not dispute that JEVS recruited Lifesharing Providers, facilitated the matching of potential Lifesharing Providers with Individuals, and set the stipend rate for Lifesharing Providers.

Turning to JEVS's direction and supervision of the Lifesharing Providers, nearly all of Plaintiffs assertions regarding JEVS's direction and supervision of Lifesharing Providers are consistent with its duty to monitor the services provided and ensure compliance with the Lifesharing Regulations. *See* 55 Pa. Code § 6500.45-46 (providing 24-hour training requirements for Lifesharing Providers); *id.* § 6500.23(a) (requiring all Lifesharing Providers and Respite Providers to undergo criminal background checks); *id.* § 6500.43(d) (requiring a Family Living Specialist to "supervis[e], monitor[] and evaluat[e] services provided to the individual" and

17

"coordinat[e] the services provided to an individual"); *id.* § 6500.158(c) (requiring a Lifesharing Provider to provide services to the Individual "as specified in the individual's ISP"); *id.* § 6500.17 (requiring an initial assessment and continued monitoring of a Lifesharing Provider's home); *id.* § 6500.24 (requiring documentation by actual receipt or expense record for each purchase exceeding $15 made on behalf of the Individual); *id.* § 6500.61-110 (setting forth safety requirements for Lifesharing Provider homes); *id.* § 6500.82 (requiring an Individual's bed linens, towels, washcloths and clothing be kept clean); *id.* § 6500.121-124 (requiring Individuals to undergo a yearly physical and dental examination); *id.* § 6500.141-144 (requiring at least three meals a day be provided to the Individuals and setting forth certain nutrition requirements); *id.* § 6500.153 (requiring the Individual's ISP to include services that increase the community involvement of the Individual); *id.* § 6500.160 ("The family living home shall provide recreational and social activities, including volunteer or civic-minded opportunities and membership in National or local organizations . . . ."). As a result, JEVS exercised control merely to monitor the quality of the Lifesharing services provided and ensure compliance with the Lifesharing Regulations.

The undisputed evidence further demonstrates that Lifesharing Providers and their paired Individuals engaged in day-to-day activities without the supervision and oversight of JEVS. For example, Lifesharing Providers, without consultation from JEVS, purchased food for their paired Individuals; accompanied their paired Individuals shopping at stores of their choosing; took them to social events with family and friends; took them out to eat at restaurants of their paired Individual's choice, and engaged in entertainment and recreational activities with their paired Individuals. *See, e.g.*, Costin Dep. 93 ("Q. Did you need permission from JEVS to introduce [your paired Individual] to your friends? . . . A. No."); *id.* at 456 ("Q. Did JEVS tell you to go to [Shop

Rite, Walmart, or Shop N Bag] specifically? A. No."); *id.* at 355-56 ("Q. Who picks where you go to dinner together? . . . A. I pretty much ask [my paired Individual] where does he want to go and he chooses."); *id.* at 438 (providing Costin and his paired Individual went to see Spiderman: Homecoming because his paired Individual picked the movie); Pendleton Dep. 153 ("Q. Now, when your family or friends come over to see you . . . you don't have to get permission from JEVS for them to visit; right? A. I don't have to get permission."); *id.* at 347-48 (stating Pendleton's family offered to take M.S. bowling as a community outing without checking with JEVS but he chose to stay home); *id.* at 349 ("Q. You didn't have to consult with JEVS to see what [M.S.] could watch on T.V.; right? A. No."); *id.* at 357 ("Q. Did you ask permission from JEVS before you went food shopping this week with [your paired Individual]? A. No."); *id.* at 358 (providing Pendleton chose to take M.S. to McDonalds as a community outing). Therefore, Lifesharing Providers, not JEVS, retained the right to control the manner in which the day-to-day Lifesharing Services were performed.

Nevertheless, Plaintiffs contend JEVS had a significant right to control Lifesharing Providers. Beginning with the Lifesharing contracts, Plaintiffs assert JEVS reserved the contractual right to order Lifesharing Providers to furnish JEVS with weekly progress notes and withhold stipend payments. *See* Mot. for Summ. J. Exs. 14 & 15. Plaintiffs contend JEVS maintained further control over Lifesharing Providers through its Room and Board Contracts with Individuals. Specifically, Plaintiffs point to JEVS's ability to evict an Individual from the Lifesharing Provider's home for the Individual's failure to pay room and board and effectively terminate the Lifesharing arrangement.[23] *See* Resp. in Opp'n Ex. 15. Beyond the contractual

---

[23] In support of this argument, Plaintiffs point to a recent incident where JEVS terminated opt-in Plaintiff Keema Marshall's Lifesharing arrangement because the Individual who resided in Marshall's home failed to pay room and board. JEVS seeks to preclude reference to this example

authority, Plaintiffs also point to specific instances in which JEVS exercised control over a Lifesharing Provider's services, such as providing step-by-step instructions to Lifesharing Providers on how to care for Individuals.

To the extent Plaintiffs argue JEVS went beyond its monitoring and compliance duties under the Lifesharing Regulations, the Court finds these arguments, while showing some control, do not demonstrate control similar to that of an employer. First, with regard to Plaintiffs' argument JEVS exercised control by providing step-by-step instructions to Lifesharing Providers on how to care for Individuals, the Court does not find these instructions demonstrate control. The instructions provided by JEVS appear to be instructions on how an Individual can make progress toward achieving a specific goal consistent with the Individual's ISP. *See* Resp. in Opp'n Ex. 18, at 2 (providing instructions to a Lifesharing Provider on how to help the Individual learn to feed her dog once a day). The provision of these instructions appears consistent with JEVS's monitoring duties under the Lifesharing Regulations to ensure that Individuals are receiving proper services. *See* 55 Pa. Code § 6500.158 ("The family living home shall provide services to the individual as specified in the individual's ISP."). Further, there is no evidence suggesting Lifesharing Providers were subject to any adverse action for failing to follow the instructions provided by JEVS, which would demonstrate employer-like control over the Lifesharing arrangement. Rather, the step-by-step instructions provided appear to be *suggested* instructions, rather than *mandatory* instructions.

---

and strike the corresponding exhibit, asserting Plaintiffs failed to produce the exhibit on which they rely before the close of discovery. The Court need not decide this issue because, although the Marshall incident shows JEVS exercising its right to control, the fact that JEVS contractually has the *authority* to end a Lifesharing arrangement based on an Individual's non-payment of room and board through the addendum to the Room and Board Contracts is sufficient to demonstrate its right to control. *See Williams*, 837 F.3d at 321 ("It is the existence of the right to control that is significant, irrespective of whether the control is actually exercised."). Further, JEVS does not challenge the exhibit that sets forth its contractual right to evict an Individual for non-payment of room and board.

*Cf. Razak*, 951 F.3d at 146 (noting punishment of workers is a fact relevant to control). Thus, the instructions JEVS supplied to Lifesharing Providers do not demonstrate a right to control similar to that of an employer.

Next, with respect to JEVS requiring Lifesharing Providers to complete weekly progress notes, the Court does not find that this represents employer-like control over Lifesharing Providers. The Court finds that any control this demonstrates is related to JEVS's duty to complete monthly reports regarding an Individual's progress. *See* 55 Pa. Code 6500.43(d)(10) (providing it is the Family Living Specialist's job to "review[], sign[] and dat[e] the monthly documentation of an individual's participation and progress toward outcomes"). Specifically, the purpose of the weekly progress notes is to enable JEVS to monitor the services being provided by the Lifesharing Provider and comply with the Lifesharing Regulations. *See* Resp. in Opp'n Ex. 5, at 40 ("Q. Does JEVS still require its life sharing providers to provide progress notes weekly? A. Yes . . . it gives the specialist an idea of what is going on in the home . . . [and] also allows the specialist to do their monthly visit, their monthly summary and their quarterly summary off of the information they get from the progress notes.").

Moreover, JEVS's instruction on how to complete progress notes does not demonstrate a right to control. Despite Plaintiffs contending JEVS provided significant instruction and oversight of how to complete progress notes, they concede that JEVS did not discipline Lifesharing Providers for not following directions or making mistakes in their progress notes. *See* Costin Dep. 276 (providing JEVS never asked him to change what he wrote in his progress notes); Pendleton Dep. 328-29 (providing JEVS did not require Pendleton to fix a mistake in her progress notes where she recorded the same activity for M.S. on two consecutive weeks); *see also* Jackson Dep. 49 ("Q. Have you ever asked a JEVS life sharing provider to change progress notes that the life

sharing provider supplied to JEVS? A. No."); *cf. Razak*, 951 F.3d at 146 (noting there was a dispute of material fact as to whether employer punished putative employees for certain conduct). Additionally, the progress note training was offered as part of JEVS's annual training program and counted toward the Lifesharing Providers' required training under the Lifesharing Regulations—which JEVS was required to ensure Lifesharing Providers complied with. *See* Owens Dep. 94 (stating a 25-slide PowerPoint on how to complete progress notes was provided to Lifesharing Providers as part of their annual "documentation training"). Therefore, the guidance provided by JEVS as to how progress notes should be completed does not demonstrate control.

Insofar as Plaintiffs argue JEVS exercises control through "financial consequences," i.e., withholding a Lifesharing Provider's reimbursement check for failing to submit timely progress notes, submit their bi-weekly attendance calendar, or complete annual training, the Court does not find this fact demonstrates an employer-like right to control. *See* Resp. in Opp'n 10. While this fact demonstrates some control as it requires Lifesharing Providers to comply with JEVS's instructions to receive their stipend, it is not a significant degree of control. As with progress notes, JEVS's withholding of stipend payments is used to ensure compliance with the Lifesharing Regulations. Specifically, ensuring Lifesharing Providers are completing their requisite training and monitoring the quality of the services provided to the Individuals through the progress notes. Furthermore, as to the requirement that Lifesharing Providers must submit a bi-weekly attendance calendar, this is a necessary corollary to Lifesharing Providers receiving payment as JEVS needs to know whether the Lifesharing Provider or a Respite Provider provided services to ensure the proper Provider is paid. As a result, although JEVS retains the right to withhold a Lifesharing Provider's stipend if the Provider fails to submit timely progress notes, submit his or her bi-weekly

attendance calendar, or complete his or her annual training, the Court finds this demonstrates only a limited right to control Lifesharing Providers.

Lastly, as to Plaintiffs' argument that JEVS's use of Room and Board Contracts and collection of room and board demonstrates a significant right to control because JEVS acts like a landlord, the Court also finds this fact does not demonstrate employer-like control over Lifesharing Providers. Plaintiffs assert JEVS use of the Room and Board contracts transforms JEVS into a landlord for the Lifesharing Provider's home and Lifesharing Provider into "no more than [an] unintended third-party beneficiar[y]." Resp. in Opp'n 8. As JEVS notes, however, the Room and Board Contracts are mandated by 55 Pa. Code § 51 and JEVS cannot delegate its duty to collect room and board to Lifesharing Providers. Thus, the use of the Room and Board Contracts, like many other actions by JEVS, are required to ensure compliance with the Commonwealth's regulations.

While the Court recognizes the addendum to the Room and Board Contracts allowing JEVS to evict an Individual for the non-payment of room and board demonstrates a right to control by JEVS, the Court does not find it rises to a level of control that transforms JEVS into a landlord and Lifesharing Providers into powerless third-party beneficiaries in their own homes. First, under the Lifesharing contracts, Lifesharing Providers agree they are providing services in their own residence. *See, e.g.*, Mot. for Summ. J. Ex. 14, at ¶ 1 ("Life Sharing Supports shall be provided on premises located at the residence of the Provider . . . ."). There is no suggestion in the Lifesharing contracts that, by contracting to provide Lifesharing services, JEVS becomes a Lifesharing Provider's landlord and controls the Lifesharing Provider's home. Second, Lifesharing Providers are not powerless third-party beneficiaries in their own home. If at any point during the Lifesharing

arrangement the Lifesharing Provider becomes unhappy with the arrangement, he or she is free to end the Lifesharing arrangement for *any reason*. *See, e.g.*, *id.* at ¶¶ 31-32.

In any event, the addendum to the Room and Board Contracts demonstrates JEVS's control over *Individuals* more so than Lifesharing Providers. As noted, the Room and Board Contracts are entered into between JEVS and Individuals. JEVS power is thus to evict Individuals who fail to make their room and board payments. While this right of control tangentially impacts Lifesharing Providers, it demonstrates control over Individuals, but does not demonstrate control or management over the manner in which Lifesharing Providers perform their services to Individuals. Accordingly, Plaintiffs' argument that JEVS acts a landlord through the Room and Board Contracts and thereby retains a significant right of control is unavailing.

Considering the foregoing, the undisputed facts demonstrate JEVS did not have a significant right to control Lifesharing Providers. Rather, JEVS had a limited right to control Lifesharing Providers and its primary role was limited to recruiting Lifesharing Providers, facilitating the matching of Individuals and Lifesharing Providers, overseeing compliance with the Lifesharing Regulations, and setting the Lifesharing Providers' stipend rate. Day-to-day decisions regarding the Lifesharing arrangement were left to the discretion and control of Lifesharing Providers. While JEVS retained some control over Lifesharing Providers by requiring Lifesharing Providers to complete progress notes, withholding stipends for certain compliance issues, and retaining the ability to evict an Individual for failing to pay room and board, these facts do not demonstrate an employer-like level of control over Lifesharing Providers and the manner in which they provided services. Applying the DOL's guidance in Fact Sheet 79G, these facts demonstrate the control factor weighs in favor of finding Lifesharing Providers independent contractors. *See* Mot. for Summ. J. Ex A, at 2 (providing an employment relationship is unlikely to exist where the

Agency's role is "to recruit providers into the program, facilitate matching of consumers and providers, oversee quality management and monitoring compliance with licensing and other program requirements once the arrangement is established, and set the amount the adult foster care provider will be paid.").

### 2.   Opportunity for Profit or Loss Based on Managerial Skill

Turning to the alleged employee's opportunity for profit or loss depending upon his managerial skill, the evidence weighs in favor of finding that Lifesharing Providers are employees. The profit and loss factor "centers on whether [the plaintiff] had meaningful opportunities for profit or any significant risk of financial loss, depending upon his managerial skill." *See Cherichetti*, 906 F. Supp. 2d at 317 (citing *Martin,* 949 F.2d at 1294). This factor typically weighs in favor of finding a worker an independent contractor where the worker's earnings are tied to his performance or when the putative employee makes a capital investment that may be lost if the business does not succeed. *See Martin*, 949 F.2d at 1294.

Here, the record shows Lifesharing Providers have no meaningful opportunity for profit or loss depending upon their managerial skill. Lifesharing Providers are paid a daily stipend for each day they provide Lifesharing services. The stipend does not change, regardless of the Lifesharing Provider's skill or the type of care rendered to the Individual. The only factor that impacts a Lifesharing Provider's stipend is whether he or she provided services to an Individual. Further, there is no evidence that Lifesharing Providers make a significant capital investment that may be lost if their rendering of Lifesharing services does not succeed. The only significant investment Lifesharing Providers make in providing their services is the rental or purchase and furnishing of their own homes. There is no risk of loss, however, to this investment if the Lifesharing Providers fail to provide adequate services. Even after the Lifesharing arrangement ends, Lifesharing

Providers continue to live in the same home the Lifesharing Provider provided services in. *See* Pendleton Dep. 456 ("Q. You were able to stay at [your current address] even though JEVS terminated its lifesharing contract with you? A. Yes."). Because the record shows Lifesharing Providers have no meaningful opportunity for profit or loss depending upon their managerial skill, the second factor weighs in favor of finding that Lifesharing Providers are employees. *See Cherichetti*, 906 F. Supp. 2d at 317 (finding the profit or loss factor weighing in favor of the worker being an employee where the worker testified "that he was told he would receive the going federal rate on the postal job, and that he would be paid every week or bi-weekly" and did not make "any capital investment"); *see also DialAmerica*, 757 F.2d at 1387 (finding the second factor weighed in favor of finding plaintiffs were independent contractors where "they faced a real opportunity for either a profit or a loss in their operations, depending upon the amount of their investment and their skills in management").

### 3.  Investment in Equipment or Materials or Employment of Helpers

The next factor—the alleged employee's investment in equipment or materials required for his task, or his employment of helpers—also weighs in favor of finding that Lifesharing Providers are employees. This factor "is interrelated to the profit and loss consideration." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (1987). When evaluating an alleged employee's investment in equipment or materials and employment of helpers, it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation. *See Cherichetti*, 906 F. Supp. at 317 (citing *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) and *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)).

JEVS argues this factor weighs in favor of independent contractor status because Plaintiffs made investments into their homes by renting or owning their homes; making modifications and

repairs to the homes to comply with the Lifesharing Regulations; and purchasing furniture for Individuals. Plaintiffs argue Lifesharing Providers' expenditures are "dwarfed" by JEVS's expenditures on administrative costs, salaries, equipment, and overhead to oversee the Lifesharing arrangement. Plaintiffs further point to how JEVS reimburses Lifesharing Providers for their expenditures through the daily stipend.

Comparatively, the Court finds JEVS invests more into the Lifesharing arrangement than Lifesharing Providers and this factor therefore weighs in favor of employee status. Plaintiffs do not dispute that Lifesharing Providers provide Lifesharing services in their own homes and make certain modifications to their homes to comply with the Lifesharing Regulations. These facts by themselves tend to suggest independent contractor status because Lifesharing Providers supply and use their own resources. *Cf. Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("Courts have generally held that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status."). Nevertheless, when compared to JEVS investment, the facts demonstrate that JEVS's investment in its Lifesharing program is significantly more than Lifesharing Providers.

First, JEVS has an entire department dedicated to overseeing its Lifesharing program and the provision of Lifesharing services. Lorre Jackson, the Associate Director of JEVS's Lifesharing department, testified she supervised "three associates, three program specialists, and three part-time DSP's." Jackson Dep. 10. In running its Lifesharing program, JEVS incurs numerous overhead expenses—including insurance, program supplies, travel costs for employees, facility expenses, and administrative costs. Mot. for Summ. J. Ex. 8, at ¶ 12. Second, JEVS also provides a reimbursement stipend to Lifesharing Providers, which offsets much of the Lifesharing Providers' investment. *See* Mot. for Summ. J. Ex. 14, at ¶ 11 ("The Agency shall reimburse the

Provider at a daily rate of $60 . . . This stipend is a reimbursement for all expenses, including but not limited to room and board . . . and utilities."); *id.* Ex. 15, at ¶ 12 (same); *id.* Ex. 14, at ¶ 12 ("This stipend includes an allotted amount of $100.00 for the Provider to purchase foods, snacks, etc. of the [Individual's] liking. It's imperative that the allotment is used for that reason."); *id.* Ex. 15, at ¶ 13 (same). Based on these undisputed facts, the Court finds JEVS has invested significantly more into the Lifesharing relationship than Lifesharing Providers. Consequently, this factor weighs in favor of finding that Lifesharing Providers are employees.

### 4.   Whether Being a Lifesharing Provider Requires a Special Skill

Next, whether the service rendered required a special skill, also weighs in favor of finding Lifesharing Providers employees. Unskilled workers are more likely to be deemed employees. *Martin*, 949 F.2d at 1295. Nevertheless, all skilled workers are not independent contractors. In evaluating this factor, a court should consider "the skills necessary to locate and manage discrete work projects characteristic of independent contractors, or whether the skills are of the task-specific, specialized kind that form a piece of a larger enterprise, suggesting employee status." *Li v. Renewable Energy Sols., Inc.*, No. 11-3589, 2012 WL 589567, *9 (D.N.J. Feb. 22, 2012).

Plaintiffs argue there is no specialized skill required to be a Lifesharing Provider as there are no licensing or certification requirements, only 24 hours of training provided by JEVS. JEVS does not present any specific argument as to this factor. The Court agrees with Plaintiffs. There does not appear to be any specialized skills required to be a Lifesharing Provider. Anyone interested in providing Lifesharing services may do so, provided they undergo the 24 hours of annual training from JEVS. The lack of skill required is further evidenced by the fact that Lifesharing Providers may designate *anyone* to be a Respite Provider (so long as they pass JEVS's criminal background and drug testing) and Respite Providers are exempt from the 24-hour annual

training requirement. *See* 55 Pa. Code § 6500.201(1) ("The following sections do not apply for individuals receiving respite care: (1) Sections 6500.45 and 6500.46 (relating to training; and annual training).").  These facts are not indicative of the "skills necessary to locate and manage discrete work projects" like those of independent contractors. *See Li*, 2012 WL 589567, at *9. Rather, the skills are more akin to the "task-specific" form that are indicative of employee status. *See id.* Accordingly, because Lifesharing Providers do not require specialized skills, this factor weighs in favor of finding Lifesharing Providers employees.

### 5.  The Permanence of the Working Relationship

The next factor—the degree of permanence of the working relationship—weighs in favor of finding that Lifesharing Providers are independent contractors. The permanence factor "turns on two considerations: (1) whether the employee had a set term with the employer, and (2) whether the employee also took outside work." *See Jimenez*, 391 F. Supp. 3d at 391 (citing *DialAmerica*, 757 F.2d at 1387). In considering these factors, the Court "'should consider the exclusivity, length and continuity of the relationship,' and keep in mind that the duration of the relationship is less significant than the hours worked and the exclusivity of the working arrangement." *Smith v. Effluent Retrieval Servs. Inc.*, No. 16-654, 2016 WL 6135573, at *5 (E.D. Pa. Oct. 21, 2016) (quoting *Cherichetti*, 906 F. Supp. 2d at 317).

As for the term of employment, Lifesharing Providers sign contracts with JEVS to perform Lifesharing services for one year. These contracts, however, are "auto-renewing" and remain in effect if neither party terminates the Lifesharing arrangement. Many Lifesharing Providers provide Lifesharing services for extended periods of time. For example, Pendleton became a Lifesharing Provider for JEVS in November 2013 and continued in that role until June 2016. There is thus a degree of permeance to the relationship, which counsels toward a finding of employee status. *See*

*DialAmerica*, 757 F.2d at 1385 (finding the term of employment counseled toward classifying the workers employees where each "worked continuously for the defendant, and many did so for long periods of time."). Nonetheless, Lifesharing Providers are free to end their Lifesharing contract at any time and take their Lifesharing services to another Agency. For example, after JEVS ended its Lifesharing arrangement with Pendleton, she began providing Lifesharing services to M.S. through Kencrest, another Agency based in Philadelphia.

Next, as for whether Lifesharing Providers take outside work, it is undisputed Lifesharing Providers maintain additional full-time employment outside of the Lifesharing arrangement. The record shows Pendleton worked full-time at JEVS's community living homes/group homes, worked on-call at a homeless shelter, and owned and operated two businesses while serving as Lifesharing Provider. Similarly, Costin maintained full-time employment as a SEPTA bus operator, earning a salary of approximately $70,000 per year plus benefits. This full-time, outside employment, weighs in favor of finding independent contractor status. *See, e.g.*, *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231-32 (3d Cir. 2019) (affirming district court's finding that the permeance factor weighed in favor of independent contractor status where the workers were "free to work at other venues."); *see also Martin*, 949 F.2d at 1295 (affirming district court's finding that the permanence factor weighed in favor of employee status where the gas station operators worked exclusively for the alleged employer).

In sum, the fact that Lifesharing Providers are free to end their relationship with JEVS at any time and transfer their services to another Agency, and maintain full-time employment outside of providing Lifesharing services outweighs the fact that they provide services for extended periods of time. The Court thus finds this factor weighs in favor of independent contractor status.

**6.   Whether Lifesharing is an Integral Part of JEVS's Business**

Turning to the final factor—whether the service rendered is an integral part of the alleged employer's business—the Court finds that Lifesharing is not integral to JEVS's business and this factor therefore weighs in favor of independent contractor status.  In considering this factor, "workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." *See DialAmerica*, 757 F.2d. at 1385.

In this case, JEVS argues Lifesharing is not an integral part of its business because Lifesharing is one of "many programs JEVS offers to help individuals living with developmental or intellectual disabilities and/or mental illness." *See* Mot. for Summ. J. 16. In contrast, Plaintiffs argue Lifesharing is an integral part of JEVS's business and JEVS could not provide Lifesharing services without Lifesharing Providers. *See* Resp. in Opp'n 18.

Although JEVS would be unable to provide Lifesharing services without Lifesharing Providers, there is no evidence demonstrating Lifesharing is an integral or primary part of JEVS's business. This is best illustrated by *Martin v. Selker Bros., Inc.*, 949 F.2d 1286 (3d Cir. 1991). In *Martin*, the Third Circuit affirmed the district court's finding that station operators were integral to defendant's gas station business as their selling of gasoline accounted for ninety percent of the defendant's business. *Id.* at 1295-96. In holding so, the Third Circuit found "the primary business and economic purpose of the stations was to transact sales of gasoline." *Id.* at 1295.

In contrast, here, the record does not show that the primary business and economic purpose of JEVS is to provide Lifesharing services. As Plaintiffs admit, JEVS provides a wide array of "Adult Residential & Day Services," including Community Homes, Community Residential Rehabilitation Services, Lifesharing, Supported Independent Living, and Tikvah Residence. *See* Resp. to Statement of Material Facts ¶ 3; Resp. in Opp'n Ex. 11, at 1-3. In addition to its Adult

31

Residential & Day Services programing, JEVS offers a host of other programming. *See* Resp. in Opp'n Ex. 11, at 3-5 (providing a list of the programs JEVS provides including "Adult Residential & Day Services," "In-Home Personal Assistance," "Job Readiness & Career Services," "Services to Employers," "Skills Training/Education," "Substance Abuse Treatment," "Veterans Services," "Employment for People with Disabilities," and "Youth & Young Adult Services."). There is no evidence showing Lifesharing is the primary Adult Residential & Day Service JEVS provides and even so, there is no evidence that Adult Residential & Day Services are themselves JEVS's primary business.

Plaintiffs nevertheless point to JEVS receiving money from the Commonwealth of Pennsylvania and the room and board payments it receives from Individuals as evidence of Lifesharing being JEVS's primary business. *See* Resp. in Opp'n 18. This evidence misses the mark. While it demonstrates that JEVS derives some income from its Lifesharing services, it bears little weight on whether Lifesharing services are JEVS's primary business. Because Plaintiffs have failed to proffer evidence demonstrating that Lifesharing is integral to JEVS's business, the final factor weighs in favor of finding independent contractor status. *See Razak*, 951 F.3d at 145 ("The burden lies with Plaintiffs to prove that they are employees.").

### C. Balancing the Economic Reality Test Factors

Upon balancing the economic reality test factors, the Court finds Lifesharing Providers are not dependent on JEVS and therefore are independent contractors under the FLSA. The ultimate consideration for the Court under the economic reality test is, considering the totality of the circumstances, whether the workers "are dependent upon the business to which they render service." *Razak*, 951 F.3d at 142 (internal quotations and citation omitted). In this instance, the undisputed facts show the economic reality is that Lifesharing Providers are not dependent on

JEVS. Mainly, JEVS has a limited right to control the manner in which Lifesharing Providers perform their services and its primary role is to monitor the services rendered and ensure compliance with the Lifesharing Regulations. This finding alone weighs strongly in favor of finding Lifesharing Providers independent contractors and carries significant weight in the balancing of the other economic reality test factors. *See, e.g.*, *id.* at 145 ("While not dispositive, right to control factor is highly relevant to analysis of whether person is 'employee' under FLSA."); *Williams*, 837 F.3d at 320-21 ("[T]he right to control is the most persuasive indication of [employee or independent contractor status]." (quoting *Lynch v. Workmen's Comp. Appeal Bd.*, 554 A.2d 159, 160 (1989))).

Further, the permeance and integral factors weigh heavily in favor of finding Lifesharing Providers independent contractors. While providing Lifesharing services through JEVS, Lifesharing Providers engage in full-time, outside employment, earning significant salaries and benefits. Lifesharing Providers also maintain complete freedom to end the Lifesharing arrangement at any time and take their services to another Agency. Further, there is no evidence Lifesharing Providers are an integral part of JEVS's business. These factors strongly suggest Lifesharing Providers are not dependent on JEVS.

Although the Court finds Lifesharing Providers do not have an opportunity for profit or loss, comparatively invest less in the Lifesharing arrangement than JEVS, and do not require special skills to render their services, these factors do not outweigh the significant weight of the control, permanence, and integral factors. When considering the totality of the circumstances, the profit and loss, investment, and special skill factors fail to show that Lifesharing Providers are dependent on JEVS. Thus, the economic reality factors balance in favor of finding Lifesharing Providers independent contractors. Given the foregoing, this balance is consistent with the DOL's

guidance in Fact Sheet 79G. *See* Mot. for Summ. J. Ex. A, at 2 (stating an employment relationship likely does not exist where an Agency's role is "to recruit providers into the program, facilitate matching of consumers and providers, oversee quality management and monitoring compliance with licensing and other program requirements once the arrangement is established, and set the amount the adult foster care provider will be paid . . . .").

Accordingly, given the significant weight of the control, permeance, and integral factors, and considering the totality of the circumstances, the Court finds the economic reality test factors balance in favor of finding that Lifesharing Providers are not dependent on JEVS and are therefore independent contractors.[24] As a result, JEVS is entitled to judgment as a matter of law of Plaintiffs' FLSA and PMWA claims.

**CONCLUSION**

In sum, because there are no genuine disputes of material fact that Lifesharing Providers are independent contractors under the economic reality test, the Court will grant JEVS's motion for summary judgment and enter judgment in favor of JEVS on all claims in the First Amended Complaint.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

---

[24] In addition to its economic reality test argument, JEVS also argues the Lifesharing Regulations do not mandate Lifesharing Providers be employees of an Agency. The Court need not address this argument as Plaintiffs do not contend the Lifesharing Regulations mandate that Lifesharing Providers are employees. *See generally* Resp. in Opp'n (arguing Fact Sheet 79G establishes Lifesharing Providers are employees, Lifesharing Providers are Employees under the economic reality test, and the alleged consequences of finding Lifesharing Providers are employees is not a proper consideration at the summary judgment stage).